OPINION
{¶ 1} Defendant-appellant, Lenzzie R. Vance ("appellant"), appeals the judgment of the Franklin County Court of Common Pleas, convicting him of five counts of gross sexual imposition and one count of tampering with evidence, and classifying him as a sexual predator. He also appeals his sentence of six consecutive three-year terms of imprisonment. *Page 2 
 {¶ 2} On December 21, 2004, appellant was charged by complaint with one count of rape, a felony of the first degree, based on an incident of abuse that allegedly occurred on February 14, 2004. On April 21, 2005, the Franklin County Grand Jury indicted appellant on five third-degree felony counts of gross sexual imposition, two fourth-degree felony counts of gross sexual imposition, three counts of rape and one count of tampering with evidence. These charges were based upon appellant's alleged sexual abuse of his stepdaughter between June 1997 and July 2004, and his alleged attempt to tamper with evidence of that abuse.
 {¶ 3} All counts were tried to a jury beginning on July 10, 2006. On July 12, 2006, the trial court granted appellant's motion to dismiss two of the rape counts. On July 14, 2006, the jury found appellant guilty on all five third-degree felony counts of gross sexual imposition and on the count of tampering with evidence. The jury found him not guilty on the two fourth-degree felony counts of gross sexual imposition and on the one remaining rape count. On September 25, 2006, following a presentence investigation and a sentencing hearing, the court sentenced appellant to one three-year term of imprisonment for each of the six counts on which he was convicted, and ordered that he serve the terms consecutively, for an aggregate sentence of 18 years. The court also classified appellant as a sexual predator.
 {¶ 4} Appellant timely appealed and advances the following assignments of error for our review:
 FIRST ASSIGNMENT OF ERROR
 The trial court erred when it entered a judgment of conviction despite the fact that the jury's decision was against the manifest weight of the evidence. This error deprived *Page 3 
Appellant of his right to due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section Sixteen of the Ohio Constitution.
 SECOND ASSIGNMENT OF ERROR
 The trial court deprived Appellant of his state and federal constitutional rights to due process and a fair trial by allowing repeated instances of improper bolstering of the alleged victim's testimony through hearsay of another State's witness and through argument in closing that the alleged victim's story was truthful.
 THIRD ASSIGNMENT OF ERROR
 The trial court erred when sentencing Appellant to serve consecutive prison terms based on facts not found by the jury or admitted by Appellant, in contravention of the Sixth Amendment to the United States Constitution and the ex post facto clause of the United States Constitution. (Citation omitted.)
 FOURTH ASSIGNMENT OF ERROR
 The trial court's finding that Appellant is a sexual predator is contrary to the manifest weight of the evidence because the state failed to produce clear and convincing evidence to support such a finding.
 FIFTH ASSIGNMENT OF ERROR
 Appellant was deprived of the effective assistance of counsel due to counsel's failure to object to the introduction of improper bolstering evidence and closing argument.
 {¶ 5} We begin by reviewing the evidence adduced at trial. Appellant is the stepfather of the victim, who was 17 years old at the time of trial. Appellant married the victim's mother when the victim was 18 months old.
 {¶ 6} The victim testified that when she was eight years old appellant asked her to lay down with him in her parents' bed when she was wearing only a T-shirt and *Page 4 
underwear. She agreed to do so, whereupon appellant put her on top of him and, while holding her with both hands, moved her back and forth and up and down. This went on for 30 to 60 minutes. The victim testified that as she got older, appellant would make sexually suggestive jokes to her and she would often find him in her bedroom when she woke up in the morning.
 {¶ 7} She recalled that appellant has a tattoo of a rose on his right groin area. She stated that she was four or five years old the first time she saw the tattoo. Beginning when she was four or five years old appellant would engage in "play fighting" or wrestling with the victim. The victim would be wearing shorts and a T-shirt or sometimes only underwear and a T-shirt. She stated that appellant would either wear only shorts or would be completely naked. She stated, "he didn't wear a lot of clothes. * * * He liked to walk around the house naked a lot. I guess it made him feel more comfortable. I don't know." (Vol. I Tr. 42-43.) While the two would wrestle, appellant would touch the victim's bottom and breasts, sometimes over her clothing and sometimes underneath her clothing. This play-fighting and touching would occur regularly from the time the victim was four or five years old.
 {¶ 8} She stated that, as she got older, she began to wake up in the morning to find appellant touching her, and she would pretend that she was still asleep. She stated that appellant would insert his fingers into her vagina. She stated that she was frightened by this, but did not do anything about it because she did not want to make appellant angry. She explained that she did not want to make him angry because she did not like his temper. The victim explained that her parents had a history of fighting throughout her childhood, including fist fighting. Her mother had left appellant three times. The victim *Page 5 
reported that she and appellant got into a fistfight with each other once. She further explained that she was afraid of appellant because he had more authority than she did.
 {¶ 9} The victim testified that when appellant would visit her bedroom early in the morning, in addition to touching her vagina, he would sometimes get on top of her and would kiss her from her breasts down to her vagina. She denied experiencing any penile penetration. She testified that she never actually saw appellant ejaculate, but on one occasion she could feel fluid and saw spots on the sheet afterwards. She stated that the touching began when she was eight years old and happened continuously until Franklin County Children Services ("FCCS") removed from her home in February 2004. She recounted that the touching would occur early on weekend mornings, around 6 or 7 o'clock, while her mother slept in another bedroom.
 {¶ 10} The victim told the jury that once, when appellant was in bed with her and touching her vagina, her mother walked in and asked appellant what he was doing. "And he said, well, I'm waking up [the victim]. And she is like, well, why? And he was like, well, what are you doing in here? [The victim's mother] said that she had a bad dream. And he said that well, he would be in there in a minute and they could talk about it, and then he left my room and then he went in there." (Id. at 48.) She stated that as she got older, the abuse went from being sporadic to occurring every weekend and being "more intense." (Id. at 38.)
 {fn11} The victim testified that when she was 12 or 13 years old appellant got into the shower with her but did not touch her at that time. He would also sometimes touch her chest or bottom while making sexual jokes, and he would tease the victim's mother about the victim's breasts being larger than her mother's. *Page 6 
 {¶ 12} The last time that appellant touched her inappropriately was on a weekend in February 2004 when she awoke to find appellant digitally penetrating her vagina. Later, she told a friend about the touching and also related how her parents fought and "how controlling I thought my stepdad was." (Id. at 36.) Her friend related this information to a school counselor, who called FCCS. FCCS took her into custody and a criminal investigation ensued.
 {¶ 13} The victim kept several diaries, which she identified as State's Exhibits 1 through 5. She testified that she had written in Exhibit 5 about being sexually abused by appellant, but that those pages are now missing. She kept Exhibit 5 in a drawer in her desk, located in her bedroom.
 {¶ 14} On cross-examination, the victim admitted that she had complained about appellant enforcing rules and controlling her. She further admitted that, on one occasion when she was fighting with her mother and appellant, she threatened to call the police and said that the police would remove her from her home.
 {¶ 15} She admitted that she had opportunities, before February 2004, to tell someone about appellant's abuse. She had had her own cellular telephone for several years and she and her mother had stayed with her maternal grandmother or her mother's sister each time her mother left appellant. On direct examination she explained that she did not tell her grandparents about the abuse because "I was more worried about how my mother felt because she was devastated from being away from [appellant]. I wasn't really thinking about myself at the time and how I felt." (Id. at 39-40.) When asked why she had not told her aunt about the abuse, she explained, "[b]ecause we were away from [appellant]. So I didn't need to." (Id. at 40.) *Page 7 
 {¶ 16} When asked, on direct examination, why she had not confided in anyone else before February 2004, she answered, "I, first of all, didn't know how to. And I didn't want to make him mad. And I wanted to keep what family I knew together." (Id. at 37.) She explained that she did not have a good relationship with her grandparents and she never knew her biological father or his family. Consequently, appellant "was the only father figure, and [her mother was the] only mother that I had. And to me, that is what I wanted. I had nobody else to go to. And at the time I trusted [appellant] most of all, and I didn't want to lose that at the time." (Id. at 37-38.) Counsel went on to inquire, "[y]ou said that you trusted him most of all. Even though your stepfather was abusing you at this time, you still trusted him?" (Id. at 38.) The victim replied in the affirmative, explaining, "[b]ecause I have known him since I was very little. Like I said, he was the only father figure to me." (Id.)
 {¶ 17} When asked why she had not told any of her teachers about the abuse, she stated: "I didn't really think about it because, like I said, I felt the most comfort there because, you know, I trusted [appellant]. And, you know, we had the closer relationship. I never even had the relationship with my mother that much. So I was just more worried about making him mad, disappointing him." (Id. at 40-41.) When asked about her relationship with her mother the victim stated she "didn't feel close to her." (Id. at 41.) She explained that appellant "was the only one that I had a relationship with that I was close with." (Id. at 90.) She testified that whenever there was an argument, her mother always took appellant's side. The victim testified that her mother chose to continue to live with appellant, up to and during appellant's trial, so the victim remained in foster care. *Page 8 
 {¶ 18} Detective Russell Moore, of the Westerville Police Department, testified as to the steps taken in the investigation of the victim's allegations. He stated that he conducted a consensual search of appellant's home on the night of the victim's initial disclosure. The purpose of this initial search was to obtain DNA samples from appellant and from any object in the victim's room that contained bodily fluid, as revealed through the use of an alternative light source.
 {¶ 19} The detective executed a search warrant several months later. The scope of the warrant included the victim's diaries, based on the descriptions thereof that the victim had given police. However, when police executed the warrant, the diaries were not present. Detective Moore stated that when police arrived they found that the contents of the victim's room had been gathered up and placed in cardboard boxes and plastic containers stored in the room. At trial, the parties stipulated that appellant obtained possession of the diaries at some point in time and gave them to a third party, who later turned them over to police. Detective Moore then met with the victim to review and discuss the diaries.
 {¶ 20} Social worker Sha Clark ("Clark") testified next. She is employed at Columbus Children's Hospital and works in that facility's Child and Family Advocacy Center. She testified that she conducts interviews with children who are alleged victims of abuse "to gather information regarding the allegations, to ensure [the children] receive the most appropriate medical evaluation, so the history that I gather I provide to the physicians so they can complete their medical evaluation." (Id. at 177.) She told the jury that, after establishing a rapport with the interviewee through general questioning, she tells the child that the interview is for medical evaluation purposes, and that the *Page 9 
information they provide to her will be shared with the physicians conducting the evaluation.
 {¶ 21} The victim described for Clark the incidents of abuse, and Clark's testimony in this regard was consistent with the victim's trial testimony. Clark added that the victim told her that the digital penetration was substantial enough that it caused the victim pain. According to Clark, the victim also related that when the victim would walk by appellant, he would put his hands underneath her clothing and rub her breasts, stomach or genitals. The victim also told her about appellant frequently walking around the house wearing no clothing. The victim also related inappropriate sexual talk, including one incident in which appellant told the victim that he correlated her sucking her thumb when she was a baby to her sucking on his penis. The victim also told Clark about her and appellant play-fighting and how it sometimes occurred when neither of them was wearing clothes. During the play-fighting, the victim told Clark, appellant would touch the victim's breasts and genitals and sometimes he would have an erection.
 {¶ 22} She told Clark that she used to shower late in the evening, but that appellant asked her to start showering earlier, as early as after school. He would sometimes go into the bathroom while she was showering and would either sit in the bathroom and talk to her or would join her in the shower. She told Clark that she had not told her mother because the two were not close and she did not feel that her mother would believe her. She reported that her mother was home during much of the abuse and had witnessed the play-fighting and incidents of appellant putting his hands underneath her clothing. *Page 10 
 {¶ 23} Gail Horner ("Horner") testified next. She is a pediatric nurse practitioner at Columbus Children's Hospital's Center for Child and Family Advocacy and at that hospital's emergency room. Horner was qualified as an expert in the area of child sexual abuse and trauma examinations. Horner performed a physical examination of the victim on the same day in 2004 that Clark interviewed the victim. Horner testified that the physical examination was normal and there was no evidence of trauma to the genitalia, although, according to Horner, only five percent of the children she examines have evidence of such trauma. She testified that digital penetration of the vagina would not necessarily have torn the victim's hymen because the hymen had been "estrogenized," or elasticized through the effects of puberty-related hormones, making it less susceptible to tearing. Therefore, she opined, the digital penetration that the victim reported could have occurred without leaving any sign of trauma or other objective physical findings.
 {¶ 24} A forensic scientist with the Ohio Bureau of Criminal Identification and Investigation testified that forensic tests of various items of the victim's bedding were negative for the presence of semen.
 {¶ 25} The state's final witness was appellant's wife and the victim's mother ("D.V."). She married appellant in 1989. She testified that she consented to a search of the victim's room on the date the victim disclosed to police appellant's sexual abuse. She stated that when the police left that day they did not indicate to her that they would be back for any additional searches.
 {¶ 26} She explained that she and appellant found the victim's diaries while searching the victim's room one day in March 2004, after the first police search of the home and after the victim had been removed to foster care. D.V. testified that one of the *Page 11 
journals contained a page in which the victim wrote about appellant "touching her inappropriately early in the morning * * * in her private parts." (Vol. II Tr. 38.) When appellant read that "[h]e became angry at that point and tore out the page and ripped it up. And he ended putting it in the trash. And at that point there were other journals that we didn't look through because we were just — -we were — -it was just too emotional. We were just too upset." (Id.) Eventually, the two did read the remaining diaries. D.V. identified State's Exhibits 1 through 5 as the diaries that they found, and identified State's Exhibit 5 as the diary from which appellant had ripped a page.
 {¶ 27} D.V. further testified that police executed a search warrant at her home on April 9, 2004. She told the jury that, while police searched the residence, she placed a cellular telephone call to a third party to whom she and appellant had given the victim's diaries. Per the third party's instructions, she did not tell police that day about the location of the diaries. Eventually, the third party turned the diaries over to police.
 {¶ 28} D.V. verified that, one weekend morning within the time frame of October 2003 through January 2004, she found appellant in the victim's bed. The time was between the hours of 5:30 and 7:30 a.m. She testified that when she saw appellant laying in the victim's bed she could not discern whether he was wearing any clothes. However, she later testified that appellant's practice is to sleep naked. She recounted no conversation taking place between her and appellant while appellant was in the victim's bed. Rather, she stated that, upon seeing him in her daughter's bed, she simply went back to her own bed. When appellant returned to the couple's bedroom, she asked him where he had been, and he told her that he had been in the victim's room "snuggling with her." (Id. at 42.) *Page 12 
 {¶ 29} She told the jury that she did not think that appellant being in the victim's bedroom at that time was odd or unusual. She stated that she was not concerned because "no one appeared to be awake." (Id. at 43.) However, after she was shown a videotape of her interview with Westerville police, she conceded that she had told the detective that she had thought it was odd that appellant was in the victim's bed so early in the morning. She stated that appellant would frequently lay with the victim while the two played Playstation, but that would occur at 8:30 or 9:00 a.m., but never as early as it was on the morning she found appellant "snuggling" with the victim.
 {¶ 30} She confirmed that appellant began play-fighting with the victim when the victim was very young. She stated that when the victim got older, appellant would say "we are getting too old to be doing this kind of, you know, hitting each other like this. * * * [H]e said, I would sometimes accidentally hit your tits. And [the victim] would say[,] so. You know, I like doing this." (Id. at 47-48.) D.V. confirmed that appellant and the victim would sometimes be partially naked while they were play-fighting. She stated, "I don't remember a time when they were both naked together, just various combinations." (Id. at 49.) There were times, according to D.V., that either the victim or appellant would be completely naked. (Id.)
 {¶ 31} She stated that both appellant and the victim participated in and initiated the play-fighting. She recounted times when the victim would pick the lock to the couple's bedroom door until they finally changed the lock.
 {¶ 32} D.V. testified that appellant was usually naked anytime he was in the couple's home. She stated that this was appellant's practice before the two lived together and he continued to be naked while at home up to the time of trial, even though the victim *Page 13 
no longer resided there. She explained that appellant suffered from persistent groin pain that was so intense it would bring him to tears and necessitated, in 2000, surgical removal of one of his testicles. Following that surgery he consulted a pain clinic because his pain had worsened. There he was diagnosed with neuroma and irreversible nerve damage.
 {¶ 33} Since 2000, he has been treated with periodic injections in the groin area. These injections cause bruising and he is bedridden for several days following each one. The injections, D.V. stated, affect his ability to sit and lay down for several days after he receives them. However, when questioned by the state, D.V. admitted that the groin pain appellant experienced never prevented him from going to work and did not prevent him from play-fighting with the victim.
 {¶ 34} D.V. testified that she witnessed appellant and the victim "play[ing] games on each other" involving each pouring cold water on the other while the other was showering. (Id. at 50.) D.V. heard appellant make sexual jokes in front of the victim.
 {¶ 35} D.V. confirmed that she attended college from 1990 to 1994, and from 1999 to 2003. She attended classes once or twice per week, sometimes in the evenings and sometimes on Saturday mornings. When she was at class appellant would be home alone with the victim. D.V. also confirmed that she and her daughter argued frequently and have never had a good relationship. She stated that appellant was the primary disciplinarian in the household. She also confirmed that her relationship with appellant contained a high degree of tension and stress and the two would argue frequently.
 {¶ 36} D.V. testified that appellant worked as a weight room supervisor at an athletic club, which sometimes required him to work on weekends. She stated that he also regularly left the house very early on Saturday mornings to attend automobile *Page 14 
auctions. She further testified that, for some period of time during the alleged abuse, appellant ran 15 to 18 miles per day. D.V. told the jury that one of the reasons that appellant liked to be naked was because he prided himself on his physique achieved as a result of his exercise regimen.
 {¶ 37} When asked by defense counsel about arguments she would have with the victim, D.V. told the jury that the victim frequently lied and tried to conceal information, and "had an ongoing problem with behavioral issues, social issues, school, lying. * * * You almost couldn't believe anything she said because she just — -either she didn't want to get in trouble, or she just — -for her telling the truth was not a natural response when she was asked a question." (Id. at 58.) She stated that the victim would frequently accuse her of believing appellant and not her daughter, or of choosing him over her daughter. She recalled telling the victim that she was not choosing appellant over the victim, but was choosing truth over a lie.
 {¶ 38} During her heated arguments with her mother, the victim would call her mother names and threaten to call the police, D.V. recalled. During a family fight that occurred on Valentines Day 2004, the victim threatened to call the police "and said that is not all I will do." (Id. at 76.)
 {¶ 39} D.V. denied ever seeing appellant sexually abuse the victim and said that the victim never told her that appellant had been molesting the victim.
 {¶ 40} Appellant testified on his own behalf. He testified that he has walked around his home naked "as far back as I can remember," including when he was living with his parents and brother. (Id. at 139.) He added that he had been walking around naked at home "all my life." (Id.) He admitted walking around the house naked or *Page 15 
covered only in a towel when the victim was present. He admitted that "I shouldn't have done it. It was my responsibility to either put clothes on or not come out of the bedroom." (Id. at 140.) He admitted that he persisted in this behavior despite his wife's requests that he stop.
 {¶ 41} Appellant admitted he was home with the victim on Saturday mornings when his wife was at school, from the time the victim was eight years old up until the time when she was 12 years old. However, he denied ever touching the victim in any sexual way, including digitally penetrating her.
 {¶ 42} He admitted play-fighting with the victim, but stated that he only did so in the nude when, while drying off after a shower or sitting on the couch covered only by a blanket or towel, the victim would instigate the play-fighting by grabbing his towel or blanket and running away with it. He confirmed that sometimes the victim would be naked during their play-fighting. He denied that his naked play-fighting resulted in any body contact other than hitting, although he did admit that he sometimes hit the victim's breast, but, he said, this was purely accidental.
 {¶ 43} He stated that he would sit on the couch covered only by a towel or blanket because, "my injury, my underclothes or my shorts rubbed directly on the scar where I hurt." (Id. at 142.) When asked what injury he was referring to, he explained that he had had one testicle surgically removed in the year 2000. He stated that, ever since that time, he experiences sharp groin pains every 30 seconds. He has taken Darvocet to alleviate that pain and has also received injections of pain blocks that last from three weeks to three months. *Page 16 
 {¶ 44} He testified that he worked at Sawmill Athletic Club, and then Westerville Athletic Club, daily from 7:30 a.m. to 4:40 p.m. He also testified that he attended automobile auctions frequently. When he did so, he left the house at 5:45 or 6:00 a.m. He also confirmed that, prior to 2000, he ran for exercise and competed in triathlons.
 {¶ 45} He testified that when the police initially searched the victim's bedroom, pursuant to his and his wife's consent, the search lasted for two and one-half to three hours. He stated that he believed they had taken "everything out that they wanted" and he did not expect that they would return because they never told him that they were not finished searching for evidence. (Id. at 151.)
 {¶ 46} Appellant told the jury that, approximately three to four weeks after the initial police search of the victim's bedroom, he entered it and found State's Exhibit 5, one of the victim's diaries. He admitted that he read the diary and became angry and tore a page out of it. He stated that he tore out the page because he was angered by an entry calling him a name and stating that he had sexually abused the victim, not because he thought of the page as evidence. He also admitted giving all of the victim's diaries to an attorney (referred to in the presence of the jury only as a "third party") about one week later, but, he said, he did not initially tell the attorney that he had ripped a page out of one of them. He admitted that he left other pages intact that "did not make [the victim] look very good" and that contained the victim's complaints about his rules. (Id. at 187.)
 {¶ 47} Appellant admitted to making sexual jokes in front of the victim, but said he never directed them at her. He confirmed that he had volatile arguments with both his wife and the victim. He admitted that he has a temper. *Page 17 
 {¶ 48} Appellant testified that there was an incident in which his wife woke up early in the morning and found him in the victim's bed. He stated that his wife asked him why he was there and he told her that he was snuggling with the victim. He admitted that he sleeps in the nude but stated that he was wearing shorts at the time his wife saw him in the victim's bed; he told the jury he remembered he was wearing shorts because he had just come inside from letting the dogs out and retrieving the newspaper. He denied ever being in the victim's bedroom naked, despite admitting that he had been in every other room in the house naked, since he was naked the majority of the time while at home. He stated that he only laid in the victim's bed sometimes in order to play Playstation with her.
 {¶ 49} Having reviewed the evidence adduced at trial, we now turn to appellant's assignments of error. In his first assignment of error, appellant argues that the guilty verdicts were against the manifest weight of the evidence.
 {¶ 50} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 51} The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967), 10 Ohio St.2d 230,39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in *Page 18 
exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins, supra, at 387.
 {¶ 52} Appellant argues that the jury's verdict was against the manifest weight of the evidence because the evidence showed the victim's accusations of abuse were motivated by her desire to retaliate against him and her mother, and to be free of what the victim saw as appellant's controlling nature and overly strict rules. He points to the fact that the victim admitted that she felt appellant's rules were too strict and that he tried to control her and did not want her to have friends. He also directs our attention to the fact that the victim frequently argued with appellant and with her mother, and was upset that her mother seemed to always side with appellant. Additionally, she had threatened to "call the cops" on her parents not long before she disclosed appellant's alleged sexual abuse.
 {¶ 53} Appellant points out that the victim gave few specific details about the incidents of abuse and was never able to relate any incident to a holiday, birthday or any other notable day or time of year. Appellant calls the court's attention to the fact that the victim told police that she felt wetness on her sheets after the last incident of abuse, and that her sheets had not been washed since, but the authorities found no DNA evidence on her bedding. Furthermore, the victim admitted that many of the things to which she testified at trial were not in her initial statement given to police. She also admitted that she had numerous opportunities to tell family members, teachers, and friends prior to the date on which she disclosed the abuse, but had failed to do so. Appellant also points out that the physical examination of the victim yielded no evidence of trauma suggesting sexual abuse, and that, while appellant is afflicted with genital herpes, the victim is not. *Page 19 
 {¶ 54} Appellant calls attention to the fact that the victim's mother testified that it was the victim who said that she "liked" the play-fighting and did not want it to stop. Appellant denied that he was naked while with the victim in order to sexually gratify himself, and told the jury that his state of undress was necessary because of his ailments and surgery, a claim that his wife corroborated.
 {¶ 55} Appellant argues that his conviction for tampering with evidence was against the manifest weight of the evidence because he testified that he did not believe that the diary page was evidence because the police never told him they might return to gather additional evidence. He stated that he tore out the page because it made him angry, not because he sought to conceal the victim's statements therein about sexual abuse. His wife testified in much the same manner about the torn diary page.
 {¶ 56} Finally, appellant argues that the jury's acquittal on the rape and two of the gross sexual imposition counts is so inconsistent with its verdicts on the remaining gross sexual imposition counts as to be irrational.
 {¶ 57} In response, appellee argues that the vast majority of appellant's arguments challenge the victim's credibility, which is a matter exclusively within the province of the jury. Appellee argues that the jury obviously found the victim to be credible, despite her clearly expressed dissatisfaction with her home life. Appellee points out that even the victim's mother, who testified on behalf of appellant, corroborated the victim's testimony about appellant being in bed with her one day in the early morning hours. She also corroborated that appellant was often naked or partially naked when he engaged in play-fighting with the victim. *Page 20 
 {¶ 58} Appellee argues that the victim explained why she had not reported the abuse earlier. She testified that she did not feel she could tell her mother because the two did not have a close relationship, she did not tell her grandmother because she was aware that her grandmother and mother had fought about her mother's relationship with appellant, and she hesitated to disclose the abuse earlier because, despite the abuse, appellant was the one adult she trusted most, and was a father figure to her. She stated that she wanted to keep her family together. She also testified that she was fearful of making appellant angry.
 {¶ 59} Appellee points out that a conviction for gross sexual imposition requires proof of sexual contact with one who is less than 13 years old and not the defendant's spouse. "Sexual contact" is defined as any touching of an erogenous zone of another, including, but not limited to, the thigh, genitals, buttocks, pubic region, or female breasts, for the purpose of sexually arousing or gratifying either person. R.C.2907.05. Appellee maintains that there was ample evidence that appellant engaged in sexual contact with the victim on numerous occasions over a period of years, including touching her breasts during play-fighting, and touching her vagina and breasts while lying in bed with her.
 {¶ 60} Having reviewed all of the evidence, we find that the jury's verdicts were not against the manifest weight of the evidence. It was within the province of the trier of fact to assess the credibility of the witnesses and the weight to be given to their testimony. State v.Exum, Franklin App. No. 05AP-894, 2007-Ohio-2648, ¶ 33, citing State v.DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The trier of fact obviously chose to believe the testimony of the victim, which was corroborated in some respects by that of her mother. *Page 21 
 {¶ 61} Additionally, the verdict, with respect to the charge of tampering with evidence, was supported by appellant's admission that he removed and destroyed a page from the victim's diary in which she described appellant's sexual abuse, but he left intact other pages that supported his theory as to the victim's motive for making the allegations. In sum, we do not find that the jury clearly lost its way or created a manifest miscarriage of justice requiring reversal of the verdicts. Accordingly, appellant's first assignment of error is overruled.
 {¶ 62} In his second assignment of error, appellant contends that the trial court erred in admitting social worker Clark's testimony about what the victim told her about appellant's sexual abuse, and in allowing the prosecution to state, in its closing argument, that "it is important to remember [the victim is] still in counseling today, further emphasizing her credibility. She testified that, yes, she is still in counseling." (Vol. III Tr. 44.)[1]
 {¶ 63} Appellee argues initially that appellant failed to object at trial to Clark's testimony about her interview with the victim, thereby waiving all but plain error as to that issue. Appellant disagrees, pointing out that he raised the issue in a pretrial motion in limine, which the trial court denied. He argues, with no citation to authority, that the ruling was "final, and therefore plain error analysis does not apply."[2] *Page 22 
 {¶ 64} "As related to trial, a motion in limine is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury." Woods v. Columbus (1985), 23 Ohio App.3d 163,164, 23 OBR 406, 492 N.E.2d 466, quoting State v. Spahr (1976),47 Ohio App.2d 221, 1 O.O.3d 289, 353 N.E.2d 624, paragraph one of the syllabus. "There is no provision under the rules or the statutes for a motionin limine. The request was no more and no less than an appeal to the trial court for a precautionary instruction to opposing counsel to avoid error or prejudice, such instruction to be effective until admissibility was resolved. Such a request lies in the inherent power and discretion of the trial judge to control the proceedings." Spahr, supra, at 224.
 {¶ 65} "A motion in limine requires a two-step procedure: first, a pretrial consideration as to whether any reference to the area in question should be precluded until admissibility can be ascertained during trial; and, second, during the trial when the party desires to introduce the evidence which is the subject of the motion inlimine, a determination by the trial court as to the admissibility of the evidence, which is determined by the circumstances and evidence adduced in the trial and the issues raised by the evidence."Riverside Methodist Hosp. Assn. v. Guthrie (1982), 3 Ohio App.3d 308,3 OBR 355, 444 N.E.2d 1358, syllabus.
 {¶ 66} As such, the ruling on a motion in limine does not preserve the record on appeal and an appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial. Gable v.Village of Gates Mills, 103 Ohio St.3d 449, 2004-Ohio-5719, *Page 23 816 N.E.2d 1049, ¶ 35. As the court in Gable noted, the federal counterpart to Evid.R. 103 was amended in 2000 to provide that a definitive pretrial ruling on the record admitting or excluding evidence obviates the need for a party to renew an objection or offer of proof at trial to preserve a claim of error for appeal. However, the court also noted that Ohio's rule has not been so amended. Ohio Evid.R. 103 continues to provide:
 Error may not be predicated upon a ruling which admits * * * evidence unless a substantial right of the party is affected, and * * * [a] timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context * * *
 {¶ 67} Therefore, when the trial court denied appellant's motion in limine, which sought to exclude Clark's testimony about the victim's statements, the ruling was not final and appellant was required to renew his objection to the evidence at trial in order to preserve the issue for appeal. Because he did not, we review only for plain error. Likewise, appellant did not object to appellee's statement in closing argument related to the victim being in counseling, so plain error guides our analysis of this issue as well. State v. Tenace,109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 49.
 {¶ 68} According to the plain error doctrine, enunciated in Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." State v. Barnes, 94 Ohio St.3d 21, 27,2002-Ohio-68, 759 N.E.2d 1240. The Barnes court went on to explain:
 First, there must be an error, i.e., a deviation from a legal rule. State v. Hill (2001), 92 Ohio St.3d 191, 200, 749 N.E.2d 274, 283 (observing that the "first condition to be met in noticing *Page 24 
plain error is that there must be error"), citing United States v. Olano (1993), 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508, 518
(interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b]). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. State v. Sanders (2001), 92 Ohio St.3d 245, 257, 750 N.E.2d 90, 111, citing State v. Keith (1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47, 54; see, also, Olano, 507 U.S. at 734, 113 S.Ct. at 1777, 123 L.Ed.2d at 519 (a plain error under Fed.R.Crim.P. 52[b] is " `clear' or, equivalently, `obvious' " under current law). Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. See, e.g., Hill, 92 Ohio St.3d at 205, 749 N.E.2d at 286; State v. Moreland (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899; State v. Long (1978), 53 Ohio St. 2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.
Ibid.
 {¶ 69} The Barnes court further stated: "[E]ven if a forfeited error satisfies [the above noted] three prongs [of the plain error doctrine], * * * Crim.R. 52(B) does not demand that an appellate court correct it. Crim.R. 52(B) states only that a reviewing court `may' notice plain forfeited errors; a court is not obliged to correct them." Ibid. In the context of a criminal case, a reviewing court should invoke the plain error doctrine with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. State v. Jenks (1991),61 Ohio St.3d 259, 282, 574 N.E.2d 492; State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Thus, plain error does not exist unless, but for the error, the outcome of the proceeding would have been different. Jenks at 282.
 {¶ 70} The trial court committed no error in the admission of Clark's testimony regarding the victim's statements made during the medical forensic interview at the *Page 25 
Center for Child and Family Advocacy. As we have previously held, "[t]he [hearsay] exception set forth in Evid.R. 803(4) extends to statements made to social workers as long as the purpose of the statement is part of initiation of medical diagnosis or treatment. State v. Jordan, Franklin App. No. 06AP-96, 2006-Ohio-6224, ¶ 20, citing State v.Nasser, Franklin App. No. 02AP-1112, 2003-Ohio-5947, ¶ 52. "Statements made by a child identifying the perpetrator of sexual abuse may be pertinent to both diagnosis and treatment, because such statements will assist medical personnel in treating any actual injury and in assessing the emotional and psychological impact of the abuse to formulate a counseling plan or other treatment therefor." Ibid., citing State v.Dever (1992), 64 Ohio St.3d 401, 413, 596 N.E.2d 436.[3] Finding no error, plain or otherwise, we overrule appellant's second assignment of error as it relates to Clark's testimony.
 {¶ 71} Turning now to consideration of the prosecutor's comment during closing argument, we note initially that "[t]he assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court." Pang v. Minch (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph three of the syllabus. Considerable latitude is permitted in closing arguments. State v. Maurer (1984), 15 Ohio St.3d 239, 269,473 N.E.2d 768. The prosecution, however, must avoid insinuations and assertions that are calculated to mislead the jury. Berger v.United States (1935), 295 U.S. 78, 85, 55 S. Ct. 629, 79 L.Ed. 1314. *Page 26 
 {¶ 72} In the present case, when the victim testified that she was in counseling she did not relate the counseling specifically to the sexual abuse, and the jury could reasonably have inferred that she was addressing her myriad family problems in counseling. Even if the jury did infer that the victim was in counseling in order to deal with appellant's sexual abuse, thereby bolstering her credibility on this issue, there was copious other evidence relating to the victim's credibility, including testimony from one defense witness, the victim's mother, which corroborated many of the victim's claims. Under these circumstances, the prosecutor's comment does not constitute plain error because it did not affect the outcome of the trial and did not contribute unfairly to the verdicts.
 {¶ 73} For all of the foregoing reasons, appellant's second assignment of error is overruled.
 {¶ 74} Appellant's third assignment of error makes two challenges to the trial court's imposition of consecutive sentences. First, appellant argues that the imposition of consecutive terms violates his constitutional rights. Specifically, he contends that the remedy the Supreme Court of Ohio imposed in State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, 845 N.E.2d 470, to address the unconstitutional aspects of Ohio's sentencing scheme violates his constitutional rights under both the Due Process and Ex Post Facto Clauses of the United States Constitution and comparable provisions of the Ohio Constitution.Foster was decided after appellant committed the crimes for which he was convicted, but before he was sentenced for same.
 {¶ 75} "In Foster, the Ohio Supreme Court held that under the United States Supreme Court's decisions in Apprendi v. New Jersey (2000),530 U.S. 466, *Page 27 120 S.Ct. 2348, 147 L.Ed.2d 435, and Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2531, 159 L.Ed.2d 403, portions of Ohio's sentencing scheme were unconstitutional because they required judicial fact finding before a defendant could be sentenced to more than the minimum sentence, the maximum sentence, and/or consecutive sentences." State v. Houston, Franklin App. No. 06AP-662, 2007-Ohio-423, ¶ 30, citing Foster, supra, at paragraph one of the syllabus. To remedy the situation, "the Ohio Supreme Court severed the offending sections from Ohio's sentencing code. Thus, pursuant to Foster, trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive or more than minimum sentences." Id. at ¶ 3, citingFoster, at ¶ 100.
 {¶ 76} In Houston we concluded that the Foster severance remedy does not violate a defendant's due process rights and right to be free from ex post facto laws because defendant "had notice `of the potential sentences at the time they committed their crimes, and because the remedial holding of Foster was not unexpected[.]' " State v.Lariva, Franklin App. No. 06AP-758, 2007-Ohio-1012, ¶ 11, citingHouston, at ¶ 4.
 {¶ 77} Next, in support of his third assignment of error, appellant argues that the trial court abused its discretion in imposing consecutive sentences, given appellant's age of 59 years, his medical conditions, his lack of previous sex offenses, the fact that he only had one victim, and the fact that the jury acquitted him of the more serious charges. Appellant argues that the court "seemed as concerned with sending a message to [appellant's] wife, who supported his position, than what was an appropriate sentence for [appellant]." (Brief of appellant, 23.) We disagree. *Page 28 
 This court recently considered the applicable standard of review for a felony sentence, particularly in light of the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, in which that court excised portions of Ohio's felony sentencing laws. In State v. Burton, Franklin App. No. 06AP-690, 2007-Ohio-1941, at ¶ 19, this court held that "R.C. 2953.08(G) requires us to continue to review felony sentences under the clear and convincing standard." Thus, "[p]ursuant to R.C. 2953.08(G), an appellate court may modify a sentence or remand for resentencing if the appellate court clearly and convincingly finds either the record does not support the sentence, or the sentence is contrary to law." State v. Tewolde, Franklin App. No. 06AP-764, 2007-Ohio-2218, at ¶ 7.
State v. Dean, Franklin App. No. 06AP-744, 2007-Ohio-3736, ¶ 6.
 {¶ 78} Pursuant to R.C. 2929.12, a trial court is required to "consider seriousness and recidivism factors outlined in R.C.2929.12(B), (C), (D), and (E) to ensure that a sentence complies with the overriding principles of felony sentencing enunciated in R.C. 2929.11." State v. Burton, Franklin App. No. 06AP-690, 2007-Ohio-1941, ¶ 31. Further, R.C. 2929.12(A) "states that the trial court may also consider `any other factors that are relevant' to the principles of felony sentencing." Ibid.
 {¶ 79} R.C. 2929.11(A) provides: "[T]he overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.12(B) provides, in pertinent part:
 The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is more serious than conduct normally constituting the offense:
 (1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim. *Page 29 
 * * *
 (6) The offender's relationship with the victim facilitated the offense.
 {¶ 80} The pertinent portions of R.C. 2929.12(C) provide:
 The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is less serious than conduct normally constituting the offense:
 * * *
 (3) In committing the offense, the offender did not cause or expect to cause physical harm to any person or property.
 {¶ 81} As relevant here, R.C. 2929.12(D) provides:
 The sentencing court shall consider all of the following that apply regarding the offender, and any other relevant factors, as factors indicating that the offender is likely to commit future crimes:
 * * *
 (5) The offender shows no genuine remorse for the offense.
 {¶ 82} R.C. 2929.12(E) provides, in relevant part:
 The sentencing court shall consider all of the following that apply regarding the offender, and any other relevant factors, as factors indicating that the offender is not likely to commit future crimes:
 * * *
 (1) Prior to committing the offense, the offender had not been adjudicated a delinquent child.
 (4) The offense was committed under circumstances not likely to recur. *Page 30 
 {¶ 83} In this case, review of the transcript of the sentencing hearing reveals that the trial court considered the required relevant factors and complied with the overriding principles of felony sentencing. In announcing appellant's sentence, the trial court explained:
 * * * [Y]ou committed not one, but five incidents of gross sexual imposition over several years. Your response to all of that was, well, we tried to stop this. We tried to get her to not come on as she did. You created the situation which led to these incidences by not setting any boundaries, and you took advantage of this girl.
 Now, defense counsel said [the victim is] not here, and she's made no statement. That is true. However, the conduct that you engaged in with her, in my view, will affect her ability to have healthy relationships for the rest of her life. Therefore, I consider these crimes to be particularly heinous.
 * * *
 But you are the one, sir, that has engaged in this heinous activity. This court, and I think any court, has a very low tolerance, and no tolerance, for those who engage in sexual activity with children, especially their own children or their adopted children. No tolerance.
 I have considered the mitigating evidence that has been provided to me. And I have considered that favorably to you. Outside of this situation, you seem to be able to function very well. But when it comes to your relationships, you are a predator. And, therefore, while I have considered the mitigating evidence, I have given it little weight.
 * * * The only question is what is an appropriate sentence for someone who has engaged in this pattern of conduct over this period of time.
 Now, given what I consider to be the seriousness of these offenses, and given the factors which are now guidelines as *Page 31 
established in State versus Foster, I will sentence you to consecutive sentences on all counts in this case.
(Vol. V Tr. 13-15.)
 {¶ 84} It is clear that the trial court followed the mandates of R.C.2929.12 and appropriately considered the circumstances of the case in light of the overriding purposes of felony sentencing. The trial court has significant discretion in determining what weight, if any, it assigns to the statutory seriousness and recidivism factors and any other relevant evidence. State v. Arnett (2000), 88 Ohio St.3d 208, 215,724 N.E.2d 793.
 {¶ 85} In this case, the court weighed heavily the fact that appellant took advantage of his familial relationship with a young child for his own sexual gratification, and that he had the power to set boundaries within his family, but chose not to do so, again for his own gratification. The court also found significant the fact that appellant engaged in a pattern of illegal activity over a period of years. The court also reasonably recognized that appellant's abuse has likely emotionally harmed the victim, despite the fact that the victim did not attend the sentencing hearing. "A discretionary decision necessitates the exercise of personal judgment, and * * * when making such judgments, the sentencing court `is not required to divorce itself from all personal experiences and make [its] decision in a vacuum.' " Id. at 215-216, quoting State v. Cook (1992), 65 Ohio St.3d 516, 529,605 N.E.2d 70, citing Barclay v. Florida (1983), 463 U.S. 939,103 S.Ct. 3418, 77 L.Ed.2d 1134.
 {¶ 86} Appellant argues that the trial court placed too much emphasis on appellant's wife's culpability when it stated, during the sentencing hearing:
 I recall a statement by the prosecutor in closing argument which I think sums up this family environment. And that *Page 32 
statement was this was a family with no boundaries. I think that is an apt description of the family environment which you and your wife created. I think you're both very responsible for this situation.
 * * *
 Now, what amazes me is that for all these years your wife saw this, your wife left three times, why she ever came back and brought a child back into this situation I have no idea. As I said, she is responsible also for this situation, not criminally responsible, but morally responsible.
(Vol. V. Tr. 13-14.)
 {¶ 87} Though the trial court clearly felt that appellant's wife was "morally responsible," the court also made it clear that appellant's sentence was based not upon any shared moral culpability of the adults in the victim's household, but, rather, upon appellant's criminal violations alone. The court stated:
 The difference is your wife committed no criminal offenses, you did. And you committed not one, but five incidents of gross sexual imposition over several years.
 * * *
 As I said, [your wife] is responsible also for this situation, not criminally responsible, but morally responsible.
 But you are the one, sir, that has engaged in this heinous activity.
(Id.)
 {¶ 88} The court appropriately and thoughtfully considered the purposes and principles of felony sentencing, and the relevant factors and focused its attention on appellant's criminal acts, his exploitation of the advantage he possessed as a stepparent, *Page 33 
his pattern of criminal activity, and his lack of remorse. On this record, the imposition of consecutive sentences was supported by the record and was not contrary to law.
 {¶ 89} For all of the foregoing reasons, appellant's third assignment of error is without merit and is overruled.
 {¶ 90} In his fourth assignment of error, appellant argues that the trial court's finding that appellant is a sexual predator is against the manifest weight of the evidence. A finding that a person is a sexual predator must be made based on clear and convincing evidence. R.C.2950.09(B)(4). Appellant contends that appellee presented no evidence at the sexual predator hearing other than the trial testimony and exhibits, and that this was not enough to meet appellee's burden of proof.
 {¶ 91} Pursuant to R.C. 2950.01(E)(1), a sexual predator is defined as a person who "has been convicted of or pleaded guilty to committing a sexually oriented offense * * * and is likely to engage in the future in one or more sexually oriented offenses." Appellant was convicted of five counts of gross sexual imposition, which is a sexually oriented offense.State v. Jones (2001), 93 Ohio St.3d 391, 395, 754 N.E.2d 1252, fn. 5. Thus, the only remaining issue for the trial court's consideration was whether appellee has proven, by clear and convincing evidence, that appellant is likely to engage in future sexually oriented offenses.
 {¶ 92} "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases." Cross v. Ledford (1954), 161 Ohio St. 469, 477,53 O.O. 361, 120 N.E.2d 118. *Page 34 
 {¶ 93} To determine if the trial court's finding of the offender's likelihood of recidivism is supported by clear and convincing evidence, an appellate court must conduct its own review of the "evidence in the transcripts, victim impact statements, presentence investigation reports, prior history of arrests and convictions, age, etc., presented at the sexual offender classification hearing with respect to R.C.2950.09(B)(2) factors." State v. Eppinger (2001), 91 Ohio St.3d 158,162, 743 N.E.2d 881. Since the trial court is vested with broad discretion in evaluating the evidence of recidivism under the legislative guidelines in R.C. 2950.09(B)(2), an appellate court must be deferential to the trial court's findings unless they are clearly erroneous. State v. Morales, 153 Ohio App.3d 635, 2003-Ohio-4200,795 N.E.2d 145, ¶ 12.
 {¶ 94} "This court will not reverse a trial court's adjudication of a defendant as a sexual predator as against the manifest weight of the evidence or supported by insufficient evidence if there exists some competent, credible evidence going to all the essential elements of the case to support that judgment." State v. Boyer, Franklin App. No. 06AP-05, 2006-Ohio-6992, ¶ 31, discretionary appeal not allowed,113 Ohio St.3d 1492, 2007-Ohio-1986, 865 N.E.2d 915, citing State v.Ibrahim, Franklin App. No. 03AP-900, 2004-Ohio-4220.
 {¶ 95} R.C. 2950.09(B)(3)(a) through (j) contains ten enumerated factors to be considered when evaluating whether a person is a sexual predator:
 (a) The offender's * * * age;
 (b) The offender's * * * prior criminal * * * record regarding all offenses, including, but not limited to, all sexual offenses;
 (c) The age of the victim of the sexually oriented offense for which sentence is to be imposed * * *; *Page 35 
 (d) Whether the sexually oriented offense for which sentence is to be imposed * * * involved multiple victims;
 (e) Whether the offender * * * used drugs or alcohol to impair the victim of the sexually oriented offense or to prevent the victim from resisting;
 (f) If the offender * * * previously has been convicted of or pleaded guilty to * * * a criminal offense, whether the offender * * * completed any sentence * * * imposed for the prior offense or act and, if the prior offense or act was a sex offense or a sexually oriented offense, whether the offender * * * participated in available programs for sexual offenders;
 (g) Any mental illness or mental disability of the offender * * *;
 (h) The nature of the offender's * * * sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse;
 (i) Whether the offender * * *, during the commission of the sexually oriented offense for which sentence is to be imposed * * *, displayed cruelty or made one or more threats of cruelty;
 (j) Any additional behavioral characteristics that contribute to the offender's * * * conduct.
 {¶ 96} There is no requisite number of these factors that must apply before a trial court may find an offender is a sexual predator, and the trial court may place as much or as little weight on any of the factors as it deems to be appropriate. State v. Walker, Franklin App. No. 04AP-1107, 2005-Ohio-3540, ¶ 10; State v. Fears, Franklin App. No. 04AP-1164, 2005-Ohio-2960, ¶ 6. Because the test is not a balancing one, even one or two of the factors are sufficient as long as the evidence of likely recidivism is clear and convincing. State v. Dudley, Franklin App. No. 05AP-144, 2005-Ohio-6503, ¶ 62; State v. *Page 36 McDonald, Franklin App. No. 03AP-853, 2004-Ohio-2571, ¶ 8; see, also,State v. Hardie (2001), 141 Ohio App.3d 1, 5, 49 N.E.2d 792.
 {¶ 97} Appellant argues that without expert testimony regarding appellant's likelihood of reoffending, appellee could not meet its burden. We disagree. At least one Ohio appellate district has held that expert evidence as to a sexually oriented offender's likelihood of recidivism is not required when making a sexual predator determination. See State v. Brewer, Fayette App. No. CA2005-04-014, 2006-Ohio-1898, ¶ 8. In addition, in rejecting the argument of an indigent defendant that he was entitled to an appointed recidivism expert, the Supreme Court of Ohio noted that an expert witness, such as a psychologist, may not be necessary if the offender has more than one sexually oriented offense conviction or clearly fits within a variety of factors listed in R.C. 2950.09(B)(2)(a) through (j). Eppinger, supra. Hence, there may be sufficient evidence presented at the hearing, absent the testimony of an expert, which would relate to the likelihood of reoffending. Ibid. The court in Eppinger specifically acknowledged that "an offender who preys on children, for example, may fit the pedophile profile, a class of sex offenders known for their especially high rate of recidivism." Ibid.
 {¶ 98} Appellant also argues that appellee cannot meet its burden of proof by relying only on the facts of the offenses of conviction. InState v. Baughman (May 4, 1999), Franklin App. No. 98AP-929, we held that the trial court in that case impermissibly based a sexual predator classification solely on the facts arising from the underlying offense. However, we have since distinguished Baughman and found its application appropriate only where the facts indicate that the sole known act of sexual misconduct was the act for which the defendant had been convicted and that fact, alone, without any *Page 37 
of the other relevant factors was the basis for the sexual predator determination. See, e.g., State v. King (Mar. 7, 2000), Franklin App. No. 99AP-597, 2000 Ohio App. LEXIS 820; State v. Henson (Mar. 14, 2000), Franklin App. No. 99AP-553; State v. Ivery (May 23, 2000), Franklin App. No. 99AP-628.
 {¶ 99} "R.C. Chapter 2950 does not contain a prohibition against being adjudicated a sexual predator based solely on the facts arising from the underlying offense. `Those facts alone are not always sufficient to support a sexual predator finding, but sometimes * * * they are.' "State v. Davis (Aug. 10, 2000), Franklin App. No. 00AP-12, 2000 Ohio App. LEXIS 3572, at *6-7, quoting Henson, supra, 2000 Ohio App. LEXIS 946, at *4. "Sexual predator determinations should be analyzed on a case-by-case basis." Id. at *7, citing Ivery, supra, 2000 Ohio App. LEXIS 2153, at *2.
 {¶ 100} The statutory factors contained in R.C. 2950.09(B)(3)(a) through (j) "are guidelines that serve an important function by providing a framework to assist judges in determining whether a defendant * * * is a sexual predator. * * * However, these guidelines do not control a judge's discretion * * * [and do] not direct the court on what weight, if any, it must assign to each factor." State v.Thompson (2001), 92 Ohio St.3d 584, 587-588, 752 N.E.2d 276.
 {¶ 101} In the present case the presentence investigation revealed that appellant had served a prison term arising from a robbery conviction in the late 1970s, and was convicted of misdemeanor negligent assault in 1997. Thus, he has a history of disregarding criminal laws, although it is undisputed that the first two convictions did not involve sexual conduct. *Page 38 
 {¶ 102} Appellant was convicted of five counts of gross sexual imposition. Although in a sexual predator determination the court looks toward the defendant's propensity to commit future offenses, past behavior is relevant because it is often an important indicator of future propensity. King, supra, at *5, citing Kansas v. Hendricks
(1997), 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501. Under R.C.2950.09(B)(3), the trial court can consider all relevant factors, including past behavior, in determining future propensity.
 {¶ 103} When appellant committed the acts for which he was convicted, the victim was between the ages of eight and 12. "The age of the victim is probative because it serves as a telling indicator of the depths of offender's inability to refrain from such illegal conduct." State v.Grau (Dec. 28, 1999), Franklin App. No. 99AP-433, 1999 Ohio App. LEXIS 6481, at *6, quoting State v. Henderson (Sept. 28, 1999), Franklin App. No. 98AP-1591, 1999 Ohio App. LEXIS 4483, at *9. Moreover, repeated acts of sexual misconduct against a youthful and vulnerable victim show a defendant's willingness to exploit persons who are relatively defenseless, and indicate a strong danger that he will seek to exploit similarly defenseless children in the future. State v. Victurine (Mar. 30, 2000), Franklin App. No. 98AP-1078. In Victurine, we went on to explain, "[i]t is virtually undisputed that there is a high potential of recidivism among sex offenders whose crimes involve the exploitation of young children." Id., 2000 Ohio App. LEXIS 1297, at *5-6, citingState v. Daniels (1998), Franklin App. No. 97APA06-830.
 {¶ 104} The victim in this case was appellant's stepdaughter, who he had helped raise since she was a toddler. She had no relationship with her biological father and she testified that appellant was her only father figure and was the adult she trusted the most. Taking advantage of a position of trust over a victim is an appropriate factor in support of *Page 39 
the trial court's sexual predator determination. State v.Sharp, Franklin App. No. 05AP-809, 2006-Ohio-3448; State v. Messer, Franklin App. No. 03AP-169, 2004-Ohio-2127; State v. Carter (Aug. 9, 2001), Franklin App. No. 00AP-1365; State v. McComas, Franklin App. No. 05AP-134, 2006-Ohio-380; State v. Hill, Franklin App. No. 06AP-300,2006-Ohio-5524.
 {¶ 105} Moreover, "[a] court may note that an offender engaging in incestuous molestation of extremely young children presents a high likelihood of reoffending, as such conduct demonstrates a profound disregard for universally accepted social norms." Boyer, supra, at ¶ 33, citing Daniels, supra. Given the "deeply ingrained and powerful social prohibitions against both incest and sexual relations with young children, the trial court could properly conclude that appellant's compulsion to commit these kinds of sexual offenses was deeply ingrained and that he was likely to re-offend." State v. Harden (Oct. 29, 1998), Franklin App. No. 98AP-223, 1998 Ohio App. LEXIS 5337, at *7, citingState v. Ferguson (Mar. 31, 1998), Franklin App. No. 97APA06-858, affirmed (1998), 84 Ohio St.3d 13, 701 N.E.2d 689.
 {¶ 106} The conduct from which appellant's conviction stems demonstrates a pattern of behavior. This court has upheld sexual predator determinations when the facts demonstrate repeated occasions of abuse of a single victim. See, e.g., Messer, supra; Hill, supra;State v. King (Mar. 7, 2000), Franklin App. No. 99AP-597. "The commission of multiple sex offenses over a period of time could be taken to demonstrate that appellant suffers from a compulsion which will drive him in the future to commit similar sexual offenses." Ibid., citingState v. Bartis (Dec. 9, 1997), Franklin App. No. 97APA05-600, affirmed (1998), 84 Ohio St.3d 9, 701 N.E.2d 687. In addition, this court has held *Page 40 
that a trial court may consider the victim's accusations that the defendant had molested her on occasions other than those from which his convictions stem, even though a jury has found them insufficient to convict the defendant on such charges. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, ¶ 53.
 {¶ 107} Refusal to acknowledge the crime and lack of remorse will weigh in favor of a sexual predator finding. State v. Ivery (May 23, 2000), Franklin App. No. 99AP-628. Appellant demonstrated neither acceptance of responsibility nor any sort of relevant regret at trial, at sentencing, or at the predator adjudication, and thus exhibited a lack of meaningful remorse.
 {¶ 108} Upon review of the record, we find the sexual predator classification is supported by clear and convincing evidence. Accordingly, appellant's fourth assignment of error is overruled.
 {¶ 109} In his fifth assignment of error, appellant argues that he was deprived of the effective assistance of counsel as a result of his trial counsel's failure to object at trial to the introduction of Clark's testimony about the victim's statements during her assessment interview at Children's Hospital Center for Child and Family Advocacy. Appellant also argues that his counsel was ineffective for failing to object to the portion of appellee's closing argument in which appellee attempted to bolster the victim's credibility by reminding the jury that the victim was in counseling. We will discuss each claimed instance of ineffective assistance of counsel in turn.
 {¶ 110} To prove ineffective assistance of counsel, defendant must show that counsel's performance was deficient. Strickland v.Washington (1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. This requires showing that counsel made errors so *Page 41 
serious that counsel was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment to the United States Constitution. Ibid.
 {¶ 111} The defendant must then show that counsel's deficient performance prejudiced his defense. Ibid. The accused must demonstrate a reasonable probability that a different verdict would have been returned but for counsel's deficiencies. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ibid. "Prejudice" exists only when counsel's performance renders the result of the trial unreliable or the proceeding unfair. Ibid.
 {¶ 112} "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. A defendant's failure to satisfy one prong of the Strickland test negates a court's need to consider the other. Id. at 697.
 {¶ 113} "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. A properly licensed attorney is presumed competent, and the burden of proving ineffectiveness is on the defendant. State v. Smith (1985), 17 Ohio St.3d 98, 100, 17 OBR 219,477 N.E.2d 1128. Thus, counsel's actions that "might be considered sound trial strategy" are presumed effective. Strickland, supra, at 689. Furthermore, counsel need not raise meritless issues. State v. Hill
(1996), 75 Ohio St.3d 195, 661 N.E.2d 1068.
 {¶ 114} We have already determined that Clark's testimony regarding the victim's statements was admissible. Therefore, appellant's trial counsel made no error in failing to object to it at trial. As for the failure to object to appellee's argument, in closing, that the victim's credibility is enhanced by the fact that she is still in counseling, we observe that: *Page 42 
 [A] reasonable attorney may decide not to interrupt his opponent's closing argument.
State v. Keene (1998), 81 Ohio St.3d 646, 668, 693 N.E.2d 246. Objections can " `disrupt the flow of a trial' " and " `are considered technical and bothersome by the factfinder.' " State v. Campbell (1994),69 Ohio St.3d 38, 53, 630 N.E.2d 339, quoting Jacobs, Ohio Evidence (1989) iii-iv. A decision not to interrupt during closing arguments reflects an "objective standard of reasonable representation."Bradley, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. State v. Myers, 97 Ohio St.3d 335, 2002-Ohio-6658,780 N.E.2d 186, ¶ 154, certiorari denied, Myers v. Ohio, 539 U.S. 906,123 S.Ct. 2254, 156 L.Ed.2d 116.
 {¶ 115} We, too, conclude that counsel's failure to object to appellee's closing argument was a reasonable strategy, especially considering there was abundant other evidence before the jury bearing upon the issue of the credibility of the victim.
 {¶ 116} For all of the foregoing reasons, appellant's fifth assignment of error is overruled.
 {¶ 117} Having overruled all of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
BRYANT and KLATT, JJ., concur.
[1] In his brief under this assignment, he also argues that the trial court erred in allowing the victim to testify that she was "in counseling." However, he has not separately stated an assignment of error with respect to this alleged error, as required by App.R. 16(A)(3). Pursuant to App.R.12(A)(1)(b), this court is required to determine the appeal based on the assignments of error set forth in the briefs. In re Brown, Franklin App. No. 03AP-1205, 2005-Ohio-2425, ¶ 11; see, also, In re Estate of Taris, Franklin App. No. 04AP-1264,2005-Ohio-1516, ¶ 5. For these reasons, we decline to address the argument concerning the victim's testimony about counseling.
[2] Reply Brief, 4.
[3] See, also, State v. Boyer, Franklin App. No. 06AP-05,2006-Ohio-6992, ¶ 18 (defendant's right to due process and right to confront witnesses under the Sixth Amendment to the United States Constitution and the Tenth Amendment to the Ohio Constitution were not violated by admission of the victim's and her mother's statements in a medical forensic interview summary prepared during the victim's assessment at Children's Hospital, where both declarants testified at trial and were therefore subject to cross-examination). *Page 1